UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| RICHARD BONDWE, | ) |
| | ) |
| Plaintiff, | ) Case No. 3:13-cv-0419 |
| | ) Judge Trauger |
| v. | ) |
| | ) |
| MAPCO EXPRESS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

Defendant MAPCO Express, Inc. ("MAPCO") has filed a Motion for Summary Judgment (Docket No. 36), to which the plaintiff has filed a Response in partial opposition (Docket No. 45), and the defendant has filed a Reply (Docket No. 46). For the reasons stated herein, the motion will be granted in part and denied part.

## BACKGROUND

### I. Overview

Bondwe is an African-American male who was originally born in Malawi, a country in southeast Africa. He was employed by MAPCO from December 2005 through July 15, 2011, when MAPCO terminated him. In his Amended Complaint, Bondwe claimed that, in violation of Title VII, MAPCO (1) created a hostile work environment, (2) failed to promote him because of his race or national origin, and (3) terminated him on the basis of race or national origin. The court granted MAPCO's motion to dismiss the hostile work environment claim. (Docket No. 26.) MAPCO has moved for summary judgment on the remaining failure to promote and discrimination claims. Bondwe concedes that MAPCO is entitled to summary judgment on his

failure to promote claim. (*See* Docket No. 45, Attach. No. 2, Memorandum, at p. 16.) Therefore, the court will grant summary judgment to MAPCO on that claim, and the court will address only Bondwe's remaining Title VII discrimination claim.

## II. Facts

Aside from some basic details about the progression of events, the parties dispute most of the pertinent facts in the case. Having examined the record, the court agrees with many of the plaintiffs' objections to the purportedly "undisputed" facts set forth by MAPCO, many of which are not fully supported by the referenced citations or that cherry-pick only favorable testimony from an otherwise muddled record. Where the facts are subject to a genuine dispute, the court has construed the facts in the light most favorable to Bondwe.

### A. Bondwe's Work History and Performance at the Hendersonville Store

Bondwe originally worked at a "BP"-branded convenience store in Hendersonville, Tennessee. In December 2005, MAPCO purchased the store and hired Bondwe to continue working there, before transferring him to a store in East Nashville. At some point, the East Nashville location closed, and, on December 23, 2010, Division Manager Damian Wyatt and District Manager Steve Adcox decided to have Bondwe continue to work for MAPCO as a "floating" manager, filling in for managers at multiple locations as needed.[1]

On January 14, 2011, MAPCO transferred Bondwe to manage a store in Hendersonville, Tennessee, where the Store Manager, Theresa Tornquist, was out on family medical leave.

---

[1] MAPCO operates approximately 370 convenience stores in seven states, including Tennessee, where it is headquartered. Its stores are divided into Divisions, which are headed by a Division Manager. Within each Division are multiple districts, which are led by District Managers.

During Tornquist's absence, Bondwe served as the acting Store Manager. On February 21, 2011, Tornquist returned from leave and resumed her role as Store Manager. Bondwe continued working at the store with Tornquist as a "Co-Manager." There is inconsistent testimony in the record about the respective roles of Bondwe and Tornquist upon her return. Construing the record in the light most favorable to Bondwe, he and Tornquist both managed the store upon her return and operated as "equals," sharing responsibility for the store's operation. On some days, Bondwe worked a 6:00 a.m. to 3:30 p.m. shift, in which he opened the store, ordered products, completed daily paperwork, and secured and counted the lottery tickets (a process referred to as a "lottery audit"). On most days when Bondwe opened the store, Tornquist would work from 11:00 a.m. to 7:00 p.m., leaving her as the only manager on duty after Bondwe left in the afternoon. On some occasions, including weekends, Tornquist (not Bondwe) worked the early shift, including opening the store, completing daily paperwork, and conducting the lottery audit. Bondwe and Tornquist both reported to District Manager Adcox, who reported to Division Manager Wyatt.

Adcox visited the Hendersonville store about once per week. At deposition, Adcox testified that, while Bondwe managed the store, its general cleanliness, organization, and stock levels were not up to par. Adcox also testified that Tornquist informed him that Bondwe was showing up late and leaving early and that Bondwe had other performance issues. Although Adcox testified to forming these impressions, he never independently verified whether Bondwe was showing up late or leaving early, and no one at MAPCO (including Adcox) ever documented any concern with Bondwe's performance before his termination. Adcox also testified that he would not have terminated Bondwe for tardiness alone, unless he had first

3

coached and counseled Bondwe and the problem became "habitual." At any rate, Adcox discussed concerns about store conditions with Bondwe and Tornquist together. (Bondwe Dep. at 64:13-18).

Tornquist also testified that she had concerns with Bondwe's performance when they managed the store. She believed that, at times, he left work "early with the job undone" and that, on at least one occasion, he had shown up late to work. She also believed that he made frequent mistakes concerning store orders, which often caused the store to run out of products during the week. According to Tornquist, "[h]e wasn't putting his whole head or effort into the job completely, trying to rush everything to get out before everything is done." Tornquist reported her concerns to Adcox over the course of several months.[2] Nevertheless, according to Bondwe, he could not recall receiving any counseling or complaints from Tornquist about his performance. Tornquist also testified that, because she believed that she and Bondwe held equivalent positions, she did not have the authority to coach or counsel Bondwe and never did so. Bondwe admits that, on occasion, he left work early to attend classes at Tennessee State University, from which he received a Bachelor's degree in May 2011.

---

[2] At pages 47-52 of the Tornquist deposition, counsel for MAPCO asks Tornquist a series of leading questions, essentially asking for "yes" and "no" answers to suggestive questions that begged a particular answer. The court agrees with Bondwe that this passage does not contain evidence that would be admissible at trial – as required for Rule 56 purposes – at least in the form in which defense counsel elicited the testimony from Tornquist at her deposition.

At the time Bondwe received his degree, Adcox did not have a college degree. Bondwe contends that his relationship with Adcox changed after he (Bondwe) received the degree from TSU.

Bondwe testified that, at some point before his termination, Adcox made abusive or racist statements to him or about him. Bondwe testified that Adcox told him to "get the f--- out here" when Adcox wanted to see him in the store and that Adcox routinely said "damn it man" when speaking to Bondwe. Bondwe found both types of comments to be verbally abusive. Also, during a visit by Adcox to the Hendersonville store, Adcox and Tornquist spoke about shortages at a different MAPCO store. Tornquist asked Adcox why that other store was experiencing so many problems, to which Adcox responded: "I didn't know that one of them [pointing to Bondwe] lived over there."

### B. The Lottery Ticket Incident and Bondwe's Termination

The Hendersonville store sold lottery tickets to customers. Before selling the tickets, a store employee would "activate" the tickets, which would then be available for purchase at the register. The remaining "unactivated" tickets were held in a locked cabinet. Generally, the activated tickets were audited daily, whereas the unactivated tickets were audited only one to three times per week. For several years prior to July 2011 (beginning well before Bondwe transferred there), the Hendersonville store's cabinet was not secure: even when "locked," it did not shut completely, apparently leaving enough room for someone to reach inside it. Tornquist was aware of this problem, but she never reported it to Adcox, her District Manager.

On July 11, 2011, MAPCO's monthly audit of the Hendersonville store revealed a significant revenue shortage (approximately $3,600), including $600 in lottery tickets, thereby

5

triggering a cash control analysis and an associated investigation by District Manager Adcox. Review of video footage revealed that, on a Friday night in early July 2011,[3] MAPCO employee Sarah Barlar had stolen lottery tickets from the store. Construing the record in the light most favorable to Bondwe, on the date of the incident, Bondwe opened the store and left by 3:00 p.m. or 4:00 p.m. (several hours before the theft), while Tornquist worked until about 7:00 p.m. (shortly before the theft).

Adcox was the key decision-maker in determining what disciplinary measures should be taken as a result of the incident. Adcox reported to Loss Prevention that Bondwe was on duty when the tickets were stolen. This was not true: Bondwe had left for the day when the tickets were stolen. He also reported that Bondwe left the lottery ticket cabinet unlocked. This was, at best, somewhat misleading, because (a) the cabinet was permanently insecure and could have been accessed even while "locked," (b) as the last manager on duty that night, Tornquist (not Bondwe) could have been responsible for leaving the cabinet unlocked, and (c) however the cabinet was accessed, Tornquist would have been at least as culpable for leaving it unlocked or ajar, where she was the last manager on duty. Furthermore, Adcox told Wyatt, his supervisor, that he and the Loss Prevention department had, "in collaboration," decided that terminating Bondwe was appropriate. This was also misleading: Loss Prevention did not conduct its own investigation of the incident, and Loss Prevention played no role whatsoever in the decision to terminate Bondwe. Adcox also told Wyatt that Bondwe had failed to lock the lottery cabinet (without mentioning Tornquist) and that Bondwe was the supervisor in charge when the tickets

---

[3] The parties have not specified the date on which this incident occurred, although it appears to have occurred on a Friday night in July 2011, prior to July 11.

went missing (which was not true). Finally, Adcox purportedly concluded that Bondwe (and only Bondwe) was responsible for failing to identify the lottery shortage, even though it was not clear whether it was Bondwe's responsibility or Tornquist's (or both) to have discovered the issue.

On July 15, 2011, MAPCO terminated Bondwe. Adcox informed Bondwe of his termination. On his termination notice, Adcox stated that Bondwe was being terminated for the following reasons: "General lack of desire to perform required job functions. Poor attitude towards Management role in store. Failure to properly account for lottery shortage. And auditors had to discover the shortage[.]" Although the termination notice included multiple grounds for Bondwe's termination, the triggering event for his termination was the lottery ticket theft. According to Bondwe, in the meeting with Adcox in which Adcox terminated him, Bondwe questioned Adcox about the basis for the termination. Bondwe told Adcox: "Do you know, Steve, I'll have you know that I have kids, you know, to support." Adcox allegedly replied: "No. You [meaning Bondwe] don't give a damn about that. You know, Tennessee is employment at will and can fire you [sic] at any time." Bondwe then asked Adcox: "Oh, is it because I have a degree? That's why you are doing that?" And Adcox replied: "No, no, no. Get the f--- out of my business. You can get that degree in Africa. Use it in Africa or somewhere else."[4] On the Coaching and Counseling Form provided to him upon his termination, Bondwe wrote: "I do not think I was fired on performance. There were some issues come up which I do

---

[4] At deposition, Bondwe offered additional, different versions of Adcox's statement, all essentially to the same effect. (*See* Bondwe Dep. at 92:4-5 ("Oh, you can get that degree and a get a job in Africa."); and 97:16 ("Now you can get a job back in Africa.").)

not understand. When I got my MBA things started to change. /Race is another matter." [backslash in original].

Although MAPCO terminated Bondwe based on Adcox's conclusions, MAPCO did not terminate Tornquist. Tornquist received only a written warning from Adcox that emphasized the cluttered conditions at the store.

Bondwe contends that MAPCO terminated him because of his race or national origin, in violation of Title VII.

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the

8

party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

### I. Title VII Discrimination Standards of Proof

Title VII provides that it shall be unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a claim of discrimination by introducing direct evidence of discrimination or by presenting circumstantial evidence of discrimination that would support an inference of discrimination. *Laster v. Ctty of Kalamazoo*, 746 F.3d 714, 726-27 (6th Cir. 2014).

### II. Direct Evidence

"Direct evidence is proof that, if believed, compels 'the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). "In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 650 (6th Cir. 2012) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). "Consistent with this definition, direct

9

evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). "Evidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).

In construing potentially direct evidence of discrimination, the court may consider the context in which the statement was made, including whether the person making the statement was a decision-maker, the temporal proximity between the statement and the adverse action, and the relationship between the statement and other facts in the record. *See Ondricko*, 689 F.3d at 650-51. "[A]lthough direct evidence generally cannot be based on isolated and ambiguous remarks, when made by an individual with decision-making authority, such remarks become relevant in determining whether there is enough evidence to establish discrimination." *DiCarlo v. Potter*, 358 F.3d 408, 416 (6th Cir. 2004).

Bondwe argues that Adcox's statement to Bondwe to "get a job in Africa" (or something to that effect) constitutes direct evidence of discrimination. MAPCO argues that the statement does not constitute direct evidence because it requires inferences to draw the conclusion that race played a role in MAPCO's decision to terminate Bondwe. MAPCO also argues that Bondwe cannot show that MAPCO (via Adcox) actually acted on that predisposition. Finally, MAPCO argues that, even assuming that Bondwe has produced direct evidence of discrimination, MAPCO would have made the same decision, even in the absence of discriminatory animus.

Although it a close call, the court finds that Adcox's statement constitutes direct evidence of discrimination. Either during or immediately after telling Bondwe that he was being

10

terminated, Adcox told Bondwe to take his degree and to go back to Africa to find a job. MAPCO argues that this could be construed as Adcox telling Bondwe that he was being discriminated against for having a college degree, not because of his race or national origin. But Bondwe did not simply tell Bondwe to take his degree elsewhere – he told him to "get the f--- out of my business" and take the degree back to *Africa*, where Bondwe was born. Thus, Adcox referenced Bondwe's national origin (or at least his continent of origin). Moreover, Adcox was essentially the sole decision-maker in Bondwe's termination: Adcox conducted the investigation, drew conclusions, and elected to terminate Bondwe. Taken in context, a jury could find that Adcox's statement constitutes direct evidence of national origin discrimination. Also, although in some cases there is a relevant distinction between expressing a predisposition to discriminate and acting on that predisposition, the nature and timing of Adcox's statement effectively collapses that distinction. Adcox told Bondwe that he should "get the f--- out of my business" and "get a job in Africa" at the precise time (or immediately after) he terminated Bondwe.

As to whether MAPCO would have made the same decision regardless of Adcox's discriminatory basis for terminating Bondwe, the issue presents a triable question of fact. For reasons explained in the next section, there is ample reason to doubt whether the other grounds that Adcox articulated for terminating Bondwe (showing up late for work, failing to fill out paperwork, not doing the lottery audit, *etc.*) were valid or actually motivated MAPCO (via Adcox) to terminate Bondwe.

Accordingly, the court will permit Bondwe to present a direct evidence theory of discrimination at trial.

### III. Circumstantial Evidence

Where the claim is based on circumstantial evidence, the court applies the *McDonnell Douglas* burden-shifting framework. *Laster*, 746 F.3d at 726. Under *McDonnell Douglas*, the plaintiff must prove a *prima facie* case by showing that: "(1) he is a member of a protected class; (2) he was qualified for the job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside the protected class." *Id.* at 727. "If the plaintiff successfully proves a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision." *Ondricko*, 689 F.3d at 653. "Once the employer carries this burden, the burden of production shifts back to the plaintiff to show that the legitimate reasons offered by the employer were not its true reasons, but rather were pretext for unlawful discrimination." *Id.*

With respect to his *prima facie* case, Bondwe argues that he was treated differently than Tornquist for similarly situated conduct, because MAPCO terminated him but only issued a written discipline to Tornquist for the lottery theft incident. MAPCO argues that Bondwe cannot establish a *prima facie* case because he and Tornquist were not similarly situated. "In order to be considered 'similarly situated' for the purposes of comparison, the employment situation of the comparator must be similar to that of the plaintiff in all relevant aspects." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 837 (6th Cir. 2012). For cases involving differential disciplinary action, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would

12

distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). In cases that involve alleged differential treatment other than disciplinary action, "[c]ourts should not assume [] that the specific factors in *Mitchell* are relevant factors in cases arising under different circumstances[.]" *Ercegovich*, 154 F.3d at 352. Instead, courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employees." *Id.* In that context, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated;' rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects'." *Id.* (quoting *Pierce v. Commwlth. Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)) (emphasis in original).

Construing the disputed facts in the light most favorable to Bondwe, a reasonable jury could find that he was similarly situated to Tornquist in all relevant respects. They both managed the store, they both shared responsibility for completing paperwork, they both could (perhaps should) have discovered that the lottery ticket cabinet was not closing properly, they both reported to Adcox, they both managed the store on the date of the lottery theft, and neither of them was on duty when the lottery theft occurred. Although Adcox articulated other reasons for Bondwe's termination, the lottery ticket incident triggered discipline of both Bondwe and Tornquist, and it was the main basis for termination that Adcox conveyed to Wyatt (his Division Manager) and Loss Prevention. MAPCO terminated Bondwe but only issued a written warning to Tornquist. Although MAPCO can argue at trial that there were some distinctions between

13

Bondwe's conduct and Tornquist's conduct that justified differential forms of discipline, the court finds that Bondwe has established his *prima face* case.

Bondwe contends that it terminated Bondwe for legitimate, non-discriminatory reasons: Bondwe failed to secure the lottery ticket cabinet, he failed to conduct the lottery audit (thereby leading to the theft), he showed a "lack of desire," he had a "poor attitude" toward management, he had an inordinate amount of voids and returns, and he was showing up late and leaving early from work. These contentions find factual support in the record from contemporaneous documents or from Adcox's testimony. Therefore, the court finds that MAPCO has met its burden of production to articulate a legitimate, non-discriminatory reason for Bondwe's termination.

Bondwe argues that the grounds asserted by MAPCO are a pretext for unlawful discrimination. To demonstrate pretext and thereby defeat MAPCO's motion, Bondwe may show that MAPCO's reasons for terminating him (1) had no basis in fact, (2) did not actually motivate MAPCO to terminate him, or (3) were insufficient to explain the decision to terminate him. *See Manzer v. Diamond Shamrock Chems.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Bondwe contends that he can demonstrate pretext under all three approaches.

First, Bondwe contends that the articulated grounds for terminating him relative to the lottery ticket theft had no basis in fact. Bondwe argues that the cabinet was already broken and was permanently insecure, that he had no obligation to perform a daily count of the unactivated tickets, that Tornquist (not he) was the last manager on duty, and that Tornquist also could have discovered the issue. Thus, Bondwe argues that it was false for Adcox to represent that the lottery theft was only Bondwe's fault. His theory is supported by the evidence. Also, it does not

14

appear that Adcox conducted a thorough investigation into the incident or that he made particularized findings as to why he attributed the theft to Bondwe rather than Tornquist (or both). Moreover, Adcox may have given Loss Prevention and his superiors the false impression that the theft occurred on Bondwe's watch, which was not true. Adcox also gave Wyatt the misleading impression that Loss Prevention had "collaborated" in the decision to terminate Bondwe, which was not true. Taking all of these circumstances into account, a jury reasonably could conclude that Adcox chose to terminate Bondwe primarily for a reason that had no basis in fact.

Bondwe also argues that the asserted grounds for his termination were insufficient to motivate his termination. To prove this theory of pretext, Bondwe must show "circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008) (quoting *Manzer*, 29 F.3d at 1084). To do so, the employee ordinarily must show by a preponderance of the evidence that other employees, particularly employees not in the protected class, were not subject to the same adverse action, even though they engaged in "substantially identical conduct" to that which the employer contends motivated its discharge of the plaintiff. *Blizzard v. Marion Tech. College*, 698 F.3d 275, 286-87 (6th Cir. 2012) (quoting *Manzer*, 29 F.3d at 1084). Here, a reasonable jury could find that Bondwe and Tornquist engaged in substantially identical conduct leading to the lottery theft, or that Tornquist bore even *more* culpability for the theft than Bondwe because she was the last manager on duty that night and had worked at the store far longer than Bondwe. Thus, a jury could infer that the decision to terminate Bondwe while only issuing a written

15

warning to Tornquist demonstrates that Bondwe's role in the lottery incident was insufficient to motivate his termination.

Finally, Bondwe argues that Adcox's stated reasons "did not actually motivate" MAPCO's decision to terminate him. To prevail on this theory, Bondwe must present "additional evidence" showing the employer was motivated by illegal reasons considering both the employer's stated reason and evidence the employer offers in support of such reasons." *Manzer*, 29 F.3d at 1093. "This argument is, essentially, that [the employer's] proffered reasons did not actually motivate" the adverse action. *Blizzard*, 698 F.3dat 287 n.6 (internal quotation and emphasis omitted). Here, there is no documentation of any issues with Bondwe's job performance prior to his termination. The issues were only raised formally at the time Adcox terminated him, which could support a conclusion that Adcox used them as a pretext to pad the list of justifications for Bondwe's termination. Also, Adcox may have made misrepresentations to his superiors about Bondwe's responsibility for the lottery ticket theft, and there is negligible evidence as to how or why Adcox placed primary responsibility for the incident on Bondwe rather than Tornquist. Furthermore, according to Bondwe, Adcox verbally mistreated him on multiple occasions before his termination, made a comment that arguably denigrated blacks or Africans ("one of *them*"), and told Bondwe to "get a job in Africa" when he terminated him. Taking these facts into account, a jury could conclude that MAPCO (via Adcox) terminated Bondwe because of his race or national origin, rather than the reasons it gave to him then or is articulating now in support of its motion.

In sum, the court finds that genuine disputes of material fact preclude summary judgment in favor of MAPCO. Thus, Bondwe's discrimination claim will proceed to trial.

## **CONCLUSION**

For the reasons stated herein, MAPCO's Motion for Summary Judgment will be granted in part and denied in part. Bondwe's failure to promote claim will be dismissed with prejudice. Bondwe's national origin and race discrimination claim will proceed to trial.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge